In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2627 & 99-2652

VICKIE L. POSTMA,

Plaintiff-Appellee,
Cross-Appellant,

v.

PAUL REVERE LIFE INSURANCE COMPANY,
a Massachusetts corporation,

Defendant-Appellant,
Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 C 6575--Wayne R. Andersen, Judge.

Argued February 9, 2000--Decided August 7, 2000

Before BAUER, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.  Vickie Postma injured her back while at work for her employer, Computer Power Group ("CPG"). She thereafter filed a claim for disability benefits with her insurer, Paul Revere Insurance Company ("Paul Revere"). Paul Revere denied her claim for disability benefits and, when she appealed, continued to deny her claim despite additional evidence provided by her. In response to Paul Revere's repeated refusal to pay disability benefits, Ms. Postma filed this action in the district court. The district court granted summary judgment for Ms. Postma; Paul Revere appeals that decision. For the reasons set forth below, we affirm the decision of the district court, although on alternative grounds.

I
BACKGROUND
A.  Facts
1.
  Ms. Postma began working as a computer consultant for the Computer Power Group in 1989. As a consultant for CPG, she traveled--by car, train, and airplane--to the places of business of her clients. The work supplies she brought to her clients included boxes of training manuals and

supplies, reference materials, and reports. Her job involved a combination of both light and medium lifting: The "light lifting" encompassed the frequent lifting and carrying of objects weighing between 10 and 20 pounds, and the "medium lifting" involved the lifting of materials weighing between 25 and 50 pounds. R.29, Ex.21 at 6. At her clients' work sites, she sometimes needed to carry these boxes up and down stairs. Ms. Postma's job duties also required her to walk and to stand for significant periods of time. Some days, she reported, she needed to stand between 8 and 9 hours.

While at CPG, Ms. Postma enrolled in a long term disability insurance program provided by Paul Revere.

2.

Ms. Postma, while traveling to visit a client on October 2, 1991, boarded a train and injured her back when she tried to lift her briefcase. She consulted a chiropractor, but her condition did not improve. She then visited an orthopedic surgeon who diagnosed a herniated lumbar disc. This physician performed surgery, but Ms. Postma continued to experience pain, and she did not return to work at CPG.

On April 9, 1992, CPG terminated Ms. Postma. It had held her position open for the six-month medical leave period required by company policy and then, because she had not returned to work, discharged her.

Ms. Postma then visited a different orthopedic surgeon, Dr. Gutierrez. He diagnosed a recurrent herniated lumbar disc and performed a second surgery. After this surgery, she did not report feeling pain. On September 9, 1992, Dr. Gutierrez released Ms. Postma to return to work but placed restrictions on her work activities. She then attempted to find a position with a different employer that involved the same duties as her position at CPG but that could accommodate her medical restrictions. Even though she sent over 500 resumes to different companies and interviewed over 15 times, she did not secure employment.

In March, Ms. Postma again visited Dr. Gutierrez; however, this visit stemmed from neck pain she was experiencing. At that time, he reported that she was not suffering pain in her back. He also advised her to return to him on an "as needed" basis. R.35, Ex.F at 22.

Starting on April 26, 1993, and continuing until June 11, 1993, Ms. Postma worked for Highland

Park Animal Hospital as a veterinary assistant. While at the animal hospital, she worked subject to Dr. Gutierrez's restrictions. On June 12, however, she was admitted to a hospital for reinjuring her initial back injury. After this date, Ms. Postma's back injury again prevented her from returning to work at all.

Later that year, Ms. Postma notified Paul Revere that she intended to file a claim for disability benefits. She thereafter submitted to Paul Revere her medical records, which included Dr. Gutierrez's attending physician statement. Dr. Gutierrez's statement indicated that Ms. Postma had been unable to work in her occupation at CPG from October 1991 to October 1993 (the date of his statement).

After reviewing Ms. Postma's file, Paul Revere denied her claim for disability benefits because it opined that (1) her injury did not prevent her from performing her previous occupation's important duties, (2) she was not under the regular care of a physician, and (3) her termination from CPG ended its obligation to pay her benefits. She appealed Paul Revere's initial decision. In the process, she submitted the deposition of her manager at CPG, John Kinstler, which stated that her medical restrictions prevented her from fulfilling her job duties. Paul Revere, however, again denied Ms. Postma's claim for benefits.

Ms. Postma later received disability benefits from the Social Security Administration and settled her worker's compensation award. Both of these decisions and the evidence supporting them were provided to Paul Revere; however, it continued to deny her claim for benefits.

B. Proceedings in the District Court

Ms. Postma then filed this action against Paul Revere for breach of contract and for breach of the implied covenant of good faith and fair dealing. She requested a declaratory judgment that Paul Revere must pay her benefits, and she requested attorney's fees.

The district court held that Ms. Postma was entitled to benefits for total disability from October 2, 1991, (the date of her initial injury) to April 26, 1993, (the date she started working at the animal hospital)./1 Also, it stated that she was under a residual disability from April 26, 1993, to June 11, 1993, while she worked at the animal hospital. Finally, the court determined that she was totally disabled again following June 11, 1993 (the date she reinjured her back).

II

DISCUSSION

A.  Standard of Review

1.

   The parties dispute whether Paul Revere's long term disability ("LTD") plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. sec. 1000 et seq. Ms. Postma argues that the insurance policy was not an ERISA plan and that we therefore should review Paul Revere's decision to deny her benefits de novo. The district court held, however, that the policy was an ERISA plan.

   The district court's finding that this plan is an ERISA plan is a finding of fact that is reversed only if it is clearly erroneous. See Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1120 (9th Cir. 1998). We previously have explained that a welfare plan requires five elements:

(1) a plan, fund, or program, (2) established or maintained, (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits, (5) to participants or their beneficiaries.

Ed Miniat, Inc. v. Globe Life Ins. Group, Inc., 805 F.2d 732, 738 (7th Cir. 1986).

   According to the district court, the parties here dispute only whether the plan was "established or maintained" by "an employer." R.52 at 8. An employer establishes or maintains a plan if it enters a contract with the insurer and pays its employees' premiums. See Brundage-Peterson v. Compcare Health Serv. Ins. Corp., 877 F.2d 509, 511 (7th Cir. 1989). To help determine whether an insurance plan falls under ERISA, the Department of Labor's regulations, through a "safe harbor" provision, provide a guideline for when a plan does not fall under ERISA. The regulation that Ms. Postma claims is applicable to her case is the following:

(j) Certain group or group-type insurance programs. For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1) No contributions are made by an employer or employee organization;

(2) Participation in the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. sec. 2510.3-1(j). This court has held that "[a]n employer who creates by contract with an insurance company a group insurance plan and designates which employees are eligible to enroll in it is outside the safe harbor created by the Department of Labor regulation." Brundage-Peterson, 877 F.2d at 511. In Brundage-Peterson, we also explained that, when the employer helps defray the cost of the employee's insurance, it is even clearer that the plan falls outside of the safe harbor. See id.

   The district court determined that the plan at issue here did not fit within the Department of Labor regulations' safe harbor. Although the employees at CPG originally covered the costs of the LTD policy, CPG made LTD benefits a standard, rather than optional, benefit for all employees in February 1992 and thus began paying the premiums. The court also explained that, because CPG purchased the plan and offered it to its employees and because it started paying the premiums while Ms. Postma was still an employee (although on medical leave at the time), CPG established or maintained the benefit plan. The court's finding that CPG maintained its benefit plan for its employees is not clearly erroneous. CPG did pay its employees' premiums while Ms. Postma was still an employee. Moreover, CPG began these payments before she made her claim for benefits to Paul Revere. We note, further, that, throughout its existence, the disability policy was part of a broader benefits package maintained by CPG for its employees. Many aspects of that plan were financed in whole or in part by CPG. For purposes of determining whether a benefit plan is subject to ERISA, its various aspects

ought not be unbundled. See Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 463 (10th Cir. 1997); Glass v. United of Omaha Life Ins. Co., 33 F.3d 1341, 1345 (11th Cir. 1994); Smith v. Jefferson Pilot Life Ins. Co., 14 F.3d 562, 567 (11th Cir. 1994). We note, moreover, that CPG "performed all administrative functions associated with the maintenance of the Policy," and that, consequently, "CPG employees received discounts on the policy premiums by virtue of the fact that they were involved in a group policy through CPG." R.28 at 4. See New England Mut. Life Ins. Co. v. Baig, 166 F.3d 1, 4 (1st Cir. 1999) (stating that "finding [an ERISA] plan requires that the employer have at least some minimal, ongoing administrative scheme or practice" (citations and quotation marks omitted)). Therefore, we uphold the district court's finding that the Paul Revere insurance plan is subject to ERISA.

2.

Having decided that Paul Revere's LTD plan is subject to ERISA, we now must decide the appropriate standard for reviewing Paul Revere's decision to deny benefits. The Supreme Court set forth the applicable basic rule in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). In Firestone, the Court explained that de novo review of an ERISA plan administrator's determination to deny benefits is the default rule "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115. "Where a plan confers discretionary power on the plan administrator, the deferential 'arbitrary and capricious' standard governs." Wilczynski v. Kemper Nat'l Ins. Cos., 178 F.3d 933, 934 (7th Cir. 1999); see also Ross v. Indiana State Teacher's Ass'n Ins. Trust, 159 F.3d 1001, 1008-09 (7th Cir. 1998), cert. denied, 119 S. Ct. 113 (1999); Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1147 (7th Cir. 1998).

To determine whether a plan grants its administrator discretion, we must look to the language of the plan. See Herzberger v. Standard Ins. Co., 205 F.3d 327, 329 (7th Cir. 2000); Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan, 102 F.3d 1435, 1437-38 (7th Cir. 1996). Ms. Postma claims that the policy did not reserve discretion in Paul Revere because the contract defined "disability" objectively. The district court, however, determined that the plan granted Paul Revere discretion. We review the district court's determination de novo. See Hightshue, 135 F.3d at 1147. Because we do not believe that the plain language of the plan

grants discretion to Paul Revere as its administrator, we cannot accept the district court's determination and, therefore, hold that the appropriate standard of review is de novo.

According to the plan, for a claimant to show that she is disabled, she must provide proof that she is receiving a doctor's care. The plan states in relevant part:

Totally disabled from your own occupation or total disability from your own occupation means:

1. because of injury or sickness, you cannot perform the important duties of your own occupation;

2. you are receiving Doctor's Care. We will waive this requirement if we receive written proof acceptable to us that further Doctor's Care would be of no benefit to you; and

3. you do not work at all.

R.6, Ex.A at 13 (emphasis added). The district court concluded that the ability of Paul Revere to waive the requirement of a doctor's care, if it received proof "acceptable to us," granted Paul Revere discretion to interpret the entire policy. However, a claimant does not need to submit proof acceptable to Paul Revere unless she is seeking a waiver. In this context, the "acceptable to us" language certainly does not inform a reasonable reader of the Paul Revere policy that the administrator has discretion on the ultimate issue of whether a claimant is disabled. Indeed, the placement of such language only in the waiver provision makes such a reading of the entire disability provision so awkward as to be implausible. A determination by an insurer that an element of disability may be waived differs fundamentally from a finding that the requirements necessary to qualify for disability have been satisfied. The waiver provision is applicable to only one of the three requirements for a disability. If a claimant satisfies all three requirements for disability, she does not even need to seek Paul Revere's approval for a waiver. Therefore, because the language granting discretion is only in the clause pertaining to a waiver, we must consider this language insufficient to grant the administrator discretion.

The district court also noted that the plan requires a claimant to provide medical evidence acceptable to Paul Revere to prove eligibility for insurability. As the plan states, "EVIDENCE OF INSURABILITY means proof given to us that an employee is insurable. This proof must be based on medical

information and must be acceptable to us." R.6, Ex.A at 3. Eligibility for insurance, however, clearly is distinguishable from eligibility for benefits. Once the claimant submits proof of eligibility for insurance and the administrator determines that she is eligible, the administrator does not have discretion, based on that provision, to deny benefits. The two provisions are completely separate, and we hold that the discretion to determine eligibility for insurance does not grant the administrator discretion to determine eligibility for benefits.

Finally, Paul Revere argues that language in the plan pertaining to the proof of loss that a claimant must submit to Paul Revere is sufficient to grant Paul Revere discretion in determining whether to grant benefits. The relevant language states: "Written proof should establish facts about the claim such as occurrence, nature and extent of the disability, injury or sickness or the loss involved." R.6, Ex.A at 39. Also, "[w]e have the right to require additional written proof to verify the continuance of any disability. We may request this additional proof as often as we feel is necessary, within reason." Id. at 40. Finally, the plan explains that "[w]e have the right to require written proof of financial loss. This includes, but is not limited to: . . . any other proof we may reasonably require. . . . Payment of benefits may be contingent upon receipt of satisfactory proof of financial loss." Id. at 41.

"Proof of loss" language is standard insurance contract language. See Herzberger, 205 F.3d at 332. It does not automatically grant discretion; instead, it is the means by which the claimant submits a claim to the insurer. As this circuit recently held, language pertaining to "proof of loss," without more, is insufficient to confer discretion. See id. In Herzberger, the two ERISA plans used language such as "determine," "proof," and "satisfactory proof." We held that

the mere fact that a plan requires a determination of eligibility or entitlement by the administrator, or requires proof or satisfactory proof of the applicant's claim, or requires both a determination and proof (or satisfactory proof), does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary.

Id. Paul Revere's LTD plan does not contain any language, independent of typical policy terms that require proof of disability, to indicate that it intended to reserve discretion in itself. We therefore conclude that the proof of loss language in this policy does not confer

discretion on Paul Revere.

Because Paul Revere's insurance plan does not grant Paul Revere the discretion to determine a claimant's eligibility for benefits, we conclude that the appropriate standard for our review of Paul Revere's decision to deny benefits is de novo.

B. The Disability Claim

The question remains whether Paul Revere correctly denied Ms. Postma's application for disability benefits. The district court, employing the more deferential arbitrary and capricious standard of review, refused to uphold Paul Revere's decision to deny Ms. Postma disability benefits. Although we disagree with the district court's determination on the appropriate standard of review, we uphold the grant of summary judgment for Ms. Postma because it is clear that, when the appropriate de novo standard is employed, she has presented sufficient proof of her disability and, therefore, that she is entitled to disability benefits from Paul Revere.

1.

Paul Revere's LTD policy states that, to be totally disabled, the claimant must show:

1. because of injury or sickness, you cannot perform the important duties of your own occupation;

2. you are receiving Doctor's Care. We will waive this requirement if we receive written proof acceptable to us that further Doctor's Care would be of no benefit to you; and

3. you do not work at all.

R.6, Ex.A at 13. Ms. Postma clearly met the requirements for total disability after she injured her back: She was unable to work at all and therefore unable to perform the important duties of her occupation. Once Dr. Gutierrez released her to return to work, however, the provision for total disability no longer applied. The existence of the work release indicated that, as of September 9, 1992, Ms. Postma could perform at least some, although not all, of the duties of her occupation.

The applicable provision for Ms. Postma then became the clause for residual disability. The policy explains the requirements for residual disability as follows:
Residually disabled or residual disability means,

after a continuous period of disability which lasts at least as long as your elimination period[/2]:

1. (A) you are prevented, by the same injury or sickness which caused your disability, from performing one or more of the important duties of your own occupation; or

(B) you work at your own or some other occupation on less than a full-time basis; and

2. you are receiving Doctor's Care. We will waive this requirement if we receive written proof acceptable to us that further Doctor's Care would be of no benefit to you; and

3. you do not earn more than 80% of your prior earnings.

R.6, Ex.A at 14. Although Paul Revere admits that Ms. Postma was totally disabled until she received her work release, it claims that her work release demonstrates that she was no longer disabled./3 Ms. Postma did not meet the requirements for total disability after her work release, but the question remains whether she met the requirements for residual disability. As long as Ms. Postma was continuously disabled--either totally or residually--between her work release (September 9, 1992) and the date she reinjured her back (June 11, 1993), when she again could not work at all, she is entitled to disability benefits for the entire time following her initial back injury.

Ms. Postma may satisfy the first element for residual disability by showing that she cannot perform one or more of the important duties of her occupation at CPG. As a consultant for CPG, Ms. Postma had traveled by car, train, and airplane to her clients' businesses carrying boxes of supplies. She frequently had to lift materials weighing between 10 and 20 pounds and often had to lift materials weighing between 25 and 50 pounds. Her job duties also had required her to walk and to stand for significant periods of time. Some days, she reported, she needed to stand between 8 and 9 hours. The staffing manager at CPG, John Kinstler, also explained that, as part of her job responsibilities, Ms. Postma regularly had to lift objects that weighed more than 10 pounds, to drive for over 30 minutes, to kneel, to squat, and to bend. Dr. Gutierrez's work release for Ms. Postma listed the activities that she could not perform, including: not lifting more than 10 pounds, not driving for more than 30 minutes, not twisting, not squatting, not bending, not kneeling, and not doing any other physical activity that could injure her back.

Kinstler explained that these medical restrictions prevented Ms. Postma from performing her job responsibilities./4 Thus, due to her medical restrictions, we must conclude that Ms. Postma was unable to perform one or more of the important duties of her occupation at CPG even after her work release and even after she began working at the animal hospital.

   After Ms. Postma found employment at the animal hospital, she worked subject to Dr. Gutierrez's medical restrictions. These medical restrictions again demonstrate that she was prevented by her back injury from performing one or more of the important duties of her occupation at CPG. Dr. Gutierrez's attending physician statement further clarified that Ms. Postma was unable to perform her occupation at CPG from October 1991 (the date of her initial injury) through October 1993 (the date of his report after her reinjury). Therefore, Ms. Postma satisfies the first element of residual disability beginning on the date of her work release and continuing until she reinjured her back.

   The next element that Ms. Postma must satisfy is the requirement that she receive a doctor's care. The policy defines doctor's care as "the regular and personal care of a Doctor which under prevailing medical standards, is appropriate for the condition causing the disability." R.6, Ex.A at 15. Dr. Gutierrez stated that he provided the appropriate doctor's care for Ms. Postma's back injury, and, because Paul Revere did not provide evidence to show that Dr. Gutierrez's care did not meet prevailing medical standards, we hold that she was under a doctor's care and that she satisfies this element for disability.

   Finally, Ms. Postma must have earned less than 80% of her original income at CPG. While she was seeking employment after she received her work release, Ms. Postma clearly made less than 80% of her prior income because she did not work at all. Also, after she began working at the animal hospital, the parties do not dispute that she received less than 80% of the income she received while employed as a consultant for CPG. Thus, she meets the final element of residual disability under the policy.

   Because Ms. Postma can satisfy the plan's requirements for residual disability from the time of her work release on September 9, 1992, until her reinjury on June 11, 1993, and, because Paul Revere concedes that she can meet the elements of total disability from October 2, 1991, to September 9, 1992, and again after June 11, 1993, we hold that Ms. Postma should be awarded disability benefits.

C.  Attorneys' Fees

   Having determined that the plaintiff's action was governed by ERISA, the district court correctly acknowledged that it had discretion to award attorneys' fees to the prevailing party. See 29 U.S.C. sec. 1132(g); see also Trustmark Life Ins. Co. v. University of Chicago Hosp., 207 F.3d 876, 884 (7th Cir. 2000). We also believe that the district court was correct in its determination that, although Ms. Postma did not prevail on the threshold question of ERISA preemption, she did prevail on the ultimate question of whether she was owed disability payments from Paul Revere. Therefore, she should be considered the "prevailing party" for the purpose of awarding attorneys' fees. There is a "modest presumption" that a prevailing party is entitled to her attorneys' fees; however, "a court may decline to award fees and costs if it finds that: (1) the losing party's position had a reasonable or solid basis in law and facts; or (2) special circumstances make an award unjust." Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co., 57 F.3d 608, 617 (7th Cir. 1995) (citations and quotation marks omitted). We cannot say that the district court abused its discretion in concluding that Paul Revere's denial of benefits was not substantially justified under the law as applied to the facts of this case. See Production & Maintenance Employees' Local 504 v. Roadmaster Corp., 954 F.2d 1397, 1405 (7th Cir. 1992)./5 Accordingly, we shall not disturb its judgment in this regard.

Conclusion

   For the foregoing reasons, we affirm the decision of the district court to grant Ms. Postma's motion for summary judgment. Ms. Postma may recover her costs in this court. Ms. Postma also may recover her attorneys' fees for this appeal by filing with the district court a statement of reasonable attorneys' fees within 14 days of the issuance of this court's mandate.

AFFIRMED


/1 The district court, in its initial order, identified the applicable dates as October 2, 1991, and April 26, 1993. However, in its subsequent order, without explanation, it used the dates of October 1, 1991, and April 27, 1993. Because both the parties and the record indicate that the dates of October 2, 1991, and April 26, 1993, are the correct dates, we shall use those dates as the applicable ones.

/2 An elimination period is the length of time a claimant must wait before benefits begin. Ms. Postma's elimination period was 90 days. There is no dispute that she was continuously disabled for the 90 days of her elimination period.

/3 Paul Revere also argues that Ms. Postma's disability benefits should have ceased as soon as she was terminated by CPG. However, the policy clarifies that, as long as a claimant's disability continues, she is entitled to benefits. Because we hold that Ms. Postma was disabled continuously by her back injury, from October 1991 until at least the time when she filed this lawsuit, her benefits continued despite the fact that she no longer worked for CPG. If insurance benefits ended as soon as a claimant stopped working for her original employer, then the residual disability provision, which allows the disabled claimant to work at a different job and still receive benefits, would be superfluous.

/4 Although Kinstler stated that CPG would have been willing to provide accommodations for Ms. Postma's medical restrictions, he also admitted that CPG would need to consult with the clients Ms. Postma would work with before it could commit to accommodating her restrictions because her accommodations would require assistance from her clients. He also conceded that some clients might not want to assist CPG and Ms. Postma in accommodating her.

/5 The district court also acknowledged that our circuit on occasion has employed another test: (1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the [benefits] plan as a whole; and (5) the relative merits of the parties' positions.

Harris Trust, 57 F.3d at 616 n.5.