**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1408
_____

ALEXANDER L. MENKES; STEPHEN WOLFE,
individually and on behalf of all others similarly situated,

Appellants

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, a
New Jersey corporation;
QINETIQ NORTH AMERICA OPERATIONS, LLC, a
Delaware corporation;
QINETIQ NORTH AMERICA, INC., a Delaware
corporation;
WESTAR AEROSPACE & DEFENSE GROUP, INC, a
Nevada corporation;
DOES 1-100, presently known individuals, partnerships,
companies
and/or other entities, inclusive
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 2-12-cv-02880)
District Judge:  Hon. Susan D. Wigenton
_____

Argued:  December 10, 2013

Before:  McKEE, <u>Chief Judge</u>, FUENTES, and CHAGARES,
<u>Circuit Judges</u>.

(Filed: August 6, 2014)

Andrew P. Bell, Esq. (ARGUED)
Michael A. Galpern, Esq.
Locks Law Firm, LLC
457 Haddonfield Road, Suite 500
Cherry Hill, NJ 08002
 Counsel for Appellants

Hillary Richard, Esq. (ARGUED)
MaryAnn Sung, Esq.
Brune & Richard LLP
One Battery Park Plaza, 34th Floor
New York, NY 10004

Melissa A. Herbert, Esq.
Robin H. Rome, Esq.
Kristine V. Ryan, Esq.
Nukk-Freeman & Cerra, P.C.
26 Main Street, Suite 301
Chatham, NJ 07928
 Counsel for Appellee Prudential Insurance Co.
of America

Kimberly B. Martin, Esq.
Scott B. Smith, Esq. (ARGUED)
Bradley, Arant, Boult, Cummings LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801

Edmund S. Sauer, Esq.
Bradley, Arant, Boult, Cummings LLP
1600 Division Street, Suite 700
Nashville, TN 32703

Diane A. Bettino, Esq.
Kellie A. Lavery, Esq.
Reed Smith LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
 Counsel for Appellees Qinetiq N.A. Operations, LLC,
Qinetiq, N.A., Inc., & Westar Aerospace & Defense Group,
Inc.

—————————

OPINION

—————————

CHAGARES, Circuit Judge.

Putative class plaintiffs Alexander L. Menkes and Stephen Wolfe appeal the District Court's dismissal of their complaint for failure to state a claim. This appeal requires us to determine whether certain supplemental insurance coverage is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. We conclude that in the circumstances presented here, it is, and that it cannot be unbundled from the plaintiffs' broader employer-provided ERISA benefits plan. We then must decide whether ERISA preempts the various state law claims that the plaintiffs asserted. Concluding that it does, we will affirm the District Court's dismissal.

I.

We take the following facts from the plaintiffs' complaint, documents to which it referred and upon which it relied, and the plaintiffs' proposed amended complaint, which we must accept as true for the purposes of a motion to dismiss. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). The plaintiffs were employed by defense contractor defendant Qinetiq[1] to work on a military base in Kirkuk, Iraq in 2008. As employees, the plaintiffs were automatically enrolled in Qinetiq's Basic Long Term Disability, Basic Life, and Accidental Death and Dismemberment insurance policies (the "Basic Policies"). It

_____

[1] The plaintiffs were variously employed by defendants Qinetiq North America Operations, LLC, Qinetiq North America, Inc., and Westar Aerospace & Defense Group, Inc., all of which share the same ownership. The claims against all three of these defendants are the same, and the defendants defended this case collectively.

is undisputed that Qinetiq offered this insurance coverage pursuant to ERISA. These policies were established pursuant to a single group contract with the Prudential Insurance Company of North America, and Qinetiq paid the premiums for each of these policies on behalf of its employees.

Both plaintiffs also purchased supplemental insurance coverage to augment their basic benefits. Both purchased what the plaintiffs term "Supplemental Long Term Disability" ("Buy Up LTD") coverage, and Menkes purchased "Supplemental Accidental Death & Dismemberment" ("Supplemental AD&D") coverage (collectively, the "Supplemental Coverage").[2] The plaintiffs paid additional premiums out of their own funds for this Supplemental Coverage in return for enhanced benefits should they sustain a covered injury.

The Supplemental Coverage operated pursuant to the exact same benefit terms, rules, exclusions, and claim procedures as the Basic Policies. These terms, rules, exclusions, and claim procedures for the Basic Policies and Supplemental Coverage were outlined in a single insurance booklet certificate ("Booklet") and a single summary plan description ("SPD") for each type of insurance. That is, the terms, rules, exclusions, and claim procedures for Qinetiq's long term disability policy, for example, were contained in a single Booklet and SPD; there were not separate Booklets and SPDs for the Basic Policy and Supplemental Coverage. Each SPD explicitly stated that the insurance coverage was being provided "under your Employer's ERISA plan(s)." Appendix ("App.") 553, 621. Each Booklet stated that the plaintiffs' coverage was governed by a single group contract between Qinetiq and Prudential, and that Qinetiq was the plan sponsor and administrator. App. 552, 620. Had Qinetiq chosen not to provide (or to terminate) the Basic Policies, its employees would not have been able to purchase (or continue) the Supplemental Coverage. An employee seeking benefits under a given policy would file a single claim, not separate

---

[2] The plaintiffs' original complaint alleges that they also purchased Supplemental Term Life coverage, but they do not seek any relief related to this policy on appeal.

4

claims for Basic Policy benefits and Supplemental Coverage benefits.

As is relevant to this appeal, each Booklet informed the plaintiffs of the policies' respective war exclusion policies. The Long Term Disability Booklet provided that "[y]our plan does not cover a disability due to war, declared or undeclared, or any act of war." App. 531. The Accidental Death and Dismemberment Booklet provided that loss is not covered if it results from "[w]ar, or any act of war. 'War' means declared or undeclared war and includes resistance to armed aggression." App. 594. These war exclusion clauses applied to both the Basic Policies and the Supplemental Coverage because, again, each type of coverage was governed by a single set of documents with a single set of rules and exclusions.

The plaintiffs were not otherwise uninsured for injuries they incurred on account of war or acts of war. As part of its government contract, Qinetiq also obtained insurance for its employees as required by the Defense Base Act ("DBA"), 42 U.S.C. § 1651. DBA insurance provides coverage for war-related injuries sustained by contract employees while serving at military bases abroad. Qinetiq obtained this coverage not from Prudential, but from the Insurance Company of the State of Pennsylvania ("ICSP").

Menkes filed a claim under his Long Term Disability policy for three injuries he received while in Iraq: (1) a back injury, (2) a positive tuberculosis ("TB") test, and (3) post-traumatic stress disorder ("PTSD"). Prudential denied his claim for all three injuries. It used the war exclusion provision to deny benefits only for his PTSD injury. It declined to compensate him for his back injury because it determined that his injury did not sufficiently impair his ability to pursue his regular occupation. It declined to compensate him for his claimed TB because he subsequently had a negative TB test and showed no signs of being affected by any TB symptoms. Menkes filed only a single claim for benefits owed to him under his Long Term Disability policy — he does not allege that he filed one claim for benefits under the Basic Policy and another for benefits under the Supplemental Coverage. Menkes filed another claim for

5

benefits under his DBA policy for these same injuries. Although ICSP and Qinetiq disputed the extent of his injuries, the parties ultimately agreed to settle that claim.

Wolfe does not allege that he suffered any injury or ever filed any claim for benefits under either one of the Prudential policies or the DBA policy.

The plaintiffs filed this action in the District of New Jersey on May 14, 2012. In their original complaint, they alleged six counts, including: (1) violation of the New Jersey Consumer Fraud Act ("CFA"), N.J. Stat. Ann. § 56:8-1, et seq.; (2) violation of the Truth in Consumer Contract, Warranty, and Notice Act ("TCCWNA"), N.J. Stat. Ann. § 56:12-1, et seq.; (3) breach of contract and breach of the implied covenant of good faith and fair dealing; (4) intentional or negligent misrepresentation and/or omission; (5) punitive damages; and (6) alternatively, violation of the consumer fraud laws of various states. They contended that Prudential fraudulently induced them to buy the Supplemental Coverage knowing that any claim they filed would likely be subject to the war exclusion clauses because their place of employment was in a war zone in Iraq, rendering the Supplemental Coverage effectively worthless.[3] They additionally alleged that Prudential deliberately concealed a policy or practice of using the war exclusion clauses to deny benefits for any and all injuries suffered while stationed abroad. The remedies the plaintiffs sought were limited to return of the premiums they paid and punitive damages.[4]

The District Court dismissed the suit in its entirety. It held that the Supplemental Coverage was governed by

---

[3] These same war exclusion clauses would have rendered the Basic Policies (for which defendant Qinetiq paid all of the premiums) worthless as well.

[4] The plaintiffs brought this as a putative class action on behalf of all employees of Department of Defense contractors who worked in Iraq and/or Afghanistan from February 10, 2006 through the present who purchased Supplemental Coverage with a war exclusion clause. App. 39-40. Menkes sought to represent an additional sub-class of employees who had sought and were denied benefits under the Supplemental Coverage. App. 40.

6

ERISA and could not be unbundled from the Basic Policies. Viewing the Basic Policies and Supplemental Coverage as closely related component parts of a single plan, it held that all of the plaintiffs' state law claims were expressly preempted by ERISA's broad preemption clause, § 514(a), which provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). In the alternative, it held that the plaintiffs' claims were preempted by § 502(a) of ERISA because the causes of action that the plaintiffs asserted conflicted with ERISA's exclusive civil enforcement scheme. It also held that the DBA preempted Menkes's state law claims.

The District Court also denied the plaintiffs' motion for leave to amend their complaint as futile. The plaintiffs submitted a proposed amended complaint in which they: (1) deleted any reference to the New Jersey TCCWNA, (2) deleted all references to the term life insurance policies, and (3) added a state law breach of fiduciary duty claim. The court addressed these proposed revisions in its opinion and held that the proposed amended complaint was substantially similar to the original. The plaintiffs timely appealed.

II.

The District Court exercised jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). We have jurisdiction pursuant to 28 U.S.C. § 1291.

Our review of the District Court's grant of a motion to dismiss based on ERISA preemption is plenary. Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 268 (3d Cir. 2001). To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint has facial plausibility when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court must accept all factual allegations in the complaint as true and draw all reasonable

7

inferences in favor of the plaintiff.  <u>Phillips v. Cnty. of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008).

We review the denial of a motion for leave to amend for abuse of discretion.  <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223 (3d Cir. 2004).

### III.

The plaintiffs contend that the District Court erred in concluding that their state law claims were preempted by ERISA § 514(a), 29 U.S.C. § 1144(a), which broadly preempts state laws that "relate to" an ERISA plan.  The plaintiffs argue that their claims are not preempted because: (1) the Supplemental Coverage is not a "plan" that was "established or maintained" by Qinetiq, and (2) the Supplemental Coverage is excluded from the scope of ERISA by virtue of a regulatory safe harbor.  We conclude that the first contention is without merit and that the Supplemental Coverage, as part of Qinetiq's broader benefits plan, is governed by ERISA.

### A.

ERISA applies to "any employee benefit plan if it is established or maintained . . .  by any employer engaged in commerce."  29 U.S.C. § 1003(a).  ERISA defines an employee welfare benefit plan as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing [certain benefits] for its participants or their beneficiaries, through the purchase of insurance or otherwise."  29 U.S.C. § 1002(1).  An ERISA plan "'is established if from the surrounding circumstances a reasonable person can ascertain [1] the intended benefits, [2] a class of beneficiaries, [3] the source of financing, and [4] procedures for receiving benefits.'"  <u>Shaver v. Siemens Corp.</u>, 670 F.3d 462, 475 (3d Cir. 2012) (quoting <u>Donovan v. Dillingham</u>, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc)).  The "crucial factor" in determining whether a "plan" has been established is "whether the employer has expressed an intention to provide benefits on a

regular and long-term basis." Gruber v. Hubbard Bert Karle Weber, Inc., 159 F.3d 780, 789 (3d Cir. 1998).

One of the touchstones of a plan that is governed by ERISA is the "establishment and maintenance of a separate and ongoing administrative scheme," which the plan administrator must set up in order to determine eligibility for benefits. Shaver, 670 F.3d at 476 (citing Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1538 (3d Cir. 1992)). This feature derives from the Supreme Court's decision in Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11 (1987), in which the Court held that ERISA preemption was designed "to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations," in situations where there exists an "ongoing administrative program to meet the employer's obligation." An administrative scheme "'may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the [policy's] criteria.'" Shaver, 670 F.3d at 477 (quoting Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 257 (8th Cir. 1994)).

Given the circumstances outlined in the plaintiffs' complaint, Qinetiq "established and maintained" the Supplemental Coverage within the meaning of ERISA. It is undisputed that the Supplemental Coverage was governed by the same Booklets and SPDs as the Basic Policies. These documents quite clearly outlined the intended benefits (see App. 512-13, 571-73, describing the amount and frequency of benefit payments), the class of beneficiaries (see App. 512, 517-18, 575-76, describing who is eligible to become insured), the source of financing (see App. 513, 573, informing employees that Qinetiq paid all of the premiums for the basic Long Term Disability and basic Accidental Death and Dismemberment policies, but that employees must contribute to receive other coverage), and the procedures for receiving benefits (see App. 553-56, 621-24, detailing each policy's "claim procedures").

The portion of the SPDs that details "claim procedures" indicates that there existed a comprehensive administrative scheme for determining eligibility for benefits after an employee filed a claim. The SPDs each promised

9

that Prudential would notify a claimant regarding a determination of eligibility for benefits within forty-five days of filing a claim. The criteria for eligibility were exhaustively set out in the Booklets. If a claim were denied, Prudential promised to inform the employee in writing of the specific reason for the denial, whether the denial could be cured, and the procedures for appealing the denial. This administrative scheme clearly evidences Qinetiq's "intention to provide benefits on a regular and long-term basis." Gruber, 159 F.3d at 789. Qinetiq therefore "established and maintained" the Basic Policies and Supplemental Coverage, which operated as a single plan, within the meaning of ERISA.

B.

Although the Basic Policies indisputably were governed by ERISA, the plaintiffs argue that the Supplemental Coverage ought to be "unbundled" and analyzed separately. They contend that if the Supplemental Coverage is viewed separately, then the Supplemental Coverage is not a welfare benefit plan that is governed by ERISA because of a regulatory safe harbor that excludes certain "programs." See 29 C.F.R. § 2510.3-1(j). The plaintiffs, however, point to no authority that would suggest that closely related components of an overarching welfare benefit plan ought to be unbundled, and in the circumstances presented here, there are several compelling reasons not to do so.

All of the characteristics of the Basic Policies and Supplemental Coverage indicate that they are not two separate sources of coverage, but two parts of one broader benefits plan. All of the Basic Policies and Supplemental Coverage were governed by a single group contract between Qinetiq and Prudential. All of the information regarding benefit terms, rules, exclusions, and claim procedures for the Basic Policies and Supplemental Coverage were the same and contained in the same documents; Qinetiq did not issue separate Booklets and SPDs for the Supplemental Coverage. If an employee wanted to know, for example, the procedure for filing a claim, he would look in only one place, and then file only one claim. Purchasing the Supplemental Coverage

merely bestowed a higher level of benefits pursuant to the same terms.

Viewing the Basic Policies and Supplemental Coverage as two parts of a broader whole is consistent with ERISA's policy goals. One of the statute's principal aims is to avoid subjecting regulated entities to conflicting sources of substantive law. N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656-57 (1995). Such uniform regulation "is impossible . . . if plans are subject to different legal obligations in different States." Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 148 (2001). Making different parts of a single, integrated plan subject to differing legal regimes could actually deter employers from offering such additional coverage in the first place. Conkright v. Frommert, 559 U.S. 506, 517 (2010).

Accordingly, we hold that the Supplemental Coverage cannot be unbundled from the Basic Plans. In so holding, we join every Court of Appeals to have considered whether to unbundle closely related components of an employer's broader ERISA benefits plan and declined to do so. For example, in Gross v. Sun Life Assurance Co. of Canada, 734 F.3d 1 (1st Cir. 2013), the plaintiff's employer paid all of its employees' premiums for life and accidental death and dismemberment insurance, but employees paid all of their own premiums for optional long term disability coverage. Id. at 4. After the plaintiff's insurance company denied her coverage under the long term disability policy, she brought numerous state law claims against the carrier responsible for the long term disability policy. The district court held that her claims with respect to the long term disability policy were preempted and the Court of Appeals for the First Circuit affirmed. The Court of Appeals viewed the long term disability policy as part of a "comprehensive employee benefit plan" that the employer offered its employees. Id. at 7 (quotation marks omitted). The court noted that the employer offered all three policies pursuant to the same group contract with its insurer, and the benefits, rules, exclusions, and claim procedures were covered by the same plan documents. Id. at 8. It held that because a "'plan' under ERISA may embrace one or more policies," there was "no justification for isolating the long-term disability policy from [the employer's] insurance package." Id.; see also Sgro v. Danone Waters of

11

N. Am., Inc., 532 F.3d 940, 943 (9th Cir. 2008) ("So long as [the employer] pays for some benefits, ERISA applies to the whole plan, even if employees pay entirely for other benefits."); Postma v. Paul Revere Life Ins. Co., 223 F.3d 533, 538 (7th Cir. 2000) ("For purposes of determining whether a benefit plan is subject to ERISA, its various aspects ought not be unbundled."); Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 463 (10th Cir. 1997) (refusing to sever optional insurance coverage that "was a feature of the Plan, notwithstanding the fact that the cost of such coverage had to be contributed by the employee"); Glass v. United of Omaha Life Ins. Co., 33 F.3d 1341, 1345 (11th Cir. 1994) ("The Elect Life feature is part and parcel of the whole group insurance plan and thus ERISA governs it.").

Because the Supplemental Coverage cannot be unbundled from the Basic Policies here, the regulatory safe harbor cannot save the plaintiffs' state law claims. See Gross, 734 F.3d at 10 ("Our rejection of [the plaintiff's] assumption that [the employer] provided multiple, independent plans is fatal to her safe harbor argument."); accord Sgro, 532 F.3d at 942-43; Gaylor, 112 F.3d at 463; Glass, 33 F.3d at 1345. The safe harbor provides that "a group or group-type insurance program offered by an insurer to employees or members of an employee organization" is not considered an ERISA plan, but rather a non-ERISA "program" if the following requirements are met:

(1) No contributions are made by an employer or employee organization;
(2) Participation [in] the program is completely voluntary for employees or members;
(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the

> program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j). Group programs must meet all four criteria to be exempted from ERISA. See Stuart v. UNUM Life Ins. Co. of Am., 217 F.3d 1145, 1153 (9th Cir. 2000) (collecting authority).

It is undisputed that Qinetiq paid the premiums for the Basic Policies and that it automatically enrolled the plaintiffs in basic coverage merely because they were employees. The plaintiffs thus fail to meet the first two of the four criteria that must all apply in order for the safe harbor to carve out a "program" from ERISA's otherwise expansive "uniform regulatory regime." Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004).

IV.

Having concluded that ERISA governs the Supplemental Coverage, we must now examine whether the specific causes of action asserted by the plaintiffs are preempted by ERISA's "expansive pre-emption provisions." Id. ERISA possesses "extraordinary pre-emptive power." Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987). Congress hoped that consolidating regulation and decision-making with respect to covered plans in the federal sphere would promote uniform administration of benefit plans and avoid subjecting regulated entities to conflicting sources of substantive law. Travelers Ins., 514 U.S. at 657. Congress intended to "minimize the administrative and financial burden" imposed on regulated entities, Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990), and to expand employers' provision of benefits in light of the more "predictable set of liabilities," Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 379 (2002).

Two variants of ERISA preemption are relevant to this appeal. The first is express preemption under ERISA § 514(a). ERISA's express preemption provision provides that

13

ERISA's regulatory structure "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan [subject to ERISA]." 29 U.S.C. § 1144(a).[5] "Relate to" has always been given a broad, common-sense meaning, such that a state law "'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983). "State law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State," 29 U.S.C. § 1144(c)(1), and is "not limited to state laws specifically designed to affect employee benefit plans," Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47-48 (1987) (quotation marks omitted). In determining whether a claim "relates to" an ERISA plan, we must also consider "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive" preemption. Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325 (1997) (quotation marks omitted). State common law claims, including those raised here, routinely fall within the ambit of § 514. See Ingersoll-Rand, 498 U.S. at 140; Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65, 83 (3d Cir. 2012).

Some of the plaintiffs' claims also implicate conflict preemption.[6] Congress intended for the causes of action and remedies available under ERISA § 502 to be the exclusive

---

[5] The parties do not contend that either ERISA's "savings clause," § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A), which exempts state laws that regulate insurance, banking, or securities, or its "deemer clause," § 514(b)(2)(B), 29 U.S.C. § 1144(b)(2)(B), which makes clear that a state law that regulates insurance, banking, or securities cannot deem an employee benefit plan to be an insurance company, applies, and neither does.

[6] The District Court also analyzed the plaintiffs' claims under "complete preemption." App. 804-05. Complete preemption is a "jurisdictional concept," not a substantive concept governing which law is applicable, like express or conflict preemption. In re U.S. Healthcare, Inc., 193 F.3d 151, 160 (3d Cir. 1999). There is no dispute over subject matter jurisdiction in this suit, which is proper.

vehicles for actions by ERISA plan participants asserting improper plan administration. Pilot Life, 481 U.S. at 54. A claim is conflict preempted by § 502 when it "duplicates, supplements, or supplants the ERISA civil enforcement remedy." Aetna Health, 542 U.S. at 209. Section 502 bars any claim that "provides a form of ultimate relief in a judicial forum that add[s] to the judicial remedies provided by ERISA." Barber v. UNUM Life Ins. Co. of Am., 383 F.3d 134, 140 (3d Cir. 2004) (quotation marks omitted).

The plaintiffs' claims fall into three broad categories: (1) common law fraud, misrepresentation, and violation of the New Jersey CFA; (2) breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty; and (3) punitive damages.[7] In the circumstances presented here, ERISA preempts all three sets of claims.[8]

A.

The plaintiffs' claims for common law fraud, misrepresentation, and violation of the New Jersey CFA relate to the plaintiffs' ERISA plan because they are premised on the existence of the plan and require interpreting the plan's terms. In order to state a claim for common law fraud, a plaintiff must claim that the defendant made a material misrepresentation. See Banco Popular N. Am. v. Gandi, 876 A.2d 253, 260 (N.J. 2005). The contours of a CFA violation are similar in that the plaintiff must claim that the defendant engaged in unlawful conduct that includes employing a

---

[7] The plaintiffs' complaint also alleged violations of the New Jersey TCCWNA, which prohibits misleading contracts, and violations of statutory consumer fraud laws of every state (except Ohio) and the District of Columbia. App. 49, 55-61. The plaintiffs do not challenge the dismissal of these claims on appeal. Therefore, they have waived any arguments they had related to these laws. See Sharp v. Johnson, 669 F.3d 144, 152 n.10 (3d Cir. 2012).

[8] Because we hold that ERISA preempts all of the plaintiffs' claims, we need not reach the District Court's alternative conclusion that the plaintiffs' claims were also preempted by the DBA.

15

misrepresentation or omitting a material fact. See N.J. Stat. Ann. § 56:8-2; see also Manahawkin Convalescent v. O'Neill, 85 A.3d 947, 960 (N.J. 2014). The plaintiffs' contention here is that the defendants "deliberately concealed material facts regarding the [Supplemental Coverage], including but not limited to:  (1) the [Supplemental Coverage] did not provide disability benefits in the event Plaintiffs and members of the Class were injured in Iraq and/or Afghanistan; [and] (2) Defendant Prudential would deny the disability claims of Plaintiffs and members of the Class based upon the war exclusion in the [Supplemental Coverage]."  App. 21 (Complaint ¶ 35).

Resolving these allegations would require a court to assess the defendants' "representations in light of the plaintiffs' benefits and rights under the plans." Iola, 700 F.3d at 84.  When the plaintiffs decided to pay additional premiums to enroll in the Supplemental Coverage, they (rightly or wrongly) thought that the policies would cover them in a certain set of circumstances. The war exclusions reduced the set of covered circumstances. Determining whether the coverage was of negligible value involves determining the set of covered circumstances, which involves reference to the war exclusion, which is part of the policy. "This type of analysis — concerning the accuracy of statements . . . to plan participants in the course of administering the plans — sits within the heartland of ERISA," and ERISA expressly preempts these claims. Id. Courts have routinely held that claims like these that sound in fraud are expressly preempted by ERISA. See Pilot Life, 481 U.S. at 47 (fraudulent inducement claim preempted by ERISA); Iola, 700 F.3d at 84 (claims for misrepresentations about commissions and size of reserve fund preempted because they were premised on the existence of the ERISA plans); Berger v. Edgewater Steel Co., 911 F.2d 911, 923 (3d Cir. 1990) (misrepresentation claim premised on a deceptive statement in a letter regarding plan amendments preempted because the letter related to the ERISA plan).[9]

_____

[9] The same is true of the CFA claim.  Other Courts of Appeals have held that similar consumer fraud statutes are also expressly preempted by ERISA. See, e.g., Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 114 (2d Cir. 2008)

16

The plaintiffs attempt to circumvent this barrier by arguing that their claims relate to an unstated policy or practice of automatically denying claims based on the war exclusion clauses even in situations where the exclusions should not apply. However, this is still a claim that is about the benefits owed and is expressly preempted by ERISA. The plaintiffs ignore that proving this claim will require reference to plan documents to determine what each policy covers, and then examining Prudential's claims administration processing and procedures in light of the plan's contours. In essence, they allege that Prudential was consistently making improper benefit determinations. Where liability is predicated on a plan's administration, ERISA preempts state law claims because "a benefit determination is part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan." Aetna Health, 542 U.S. at 219; see also Kollman v. Hewitt Assocs., LLC, 487 F.3d 139, 150 (3d Cir. 2007) (determining whether erroneous benefits calculation was malpractice would require consulting what benefits the plan provides and was thus preempted).

B.

The plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty[10] are likewise expressly preempted because they also relate to the administration of the ERISA

(claim under the Connecticut Unfair Trade Practices Act concerning improper denial of benefits related to the plan and was preempted); Anderson v. Humana, Inc., 24 F.3d 889, 891 (7th Cir. 1994) (application of Illinois's consumer protection law to representations made in documents regulated by ERISA plan was preempted). A number of district courts in this Circuit have also held that the New Jersey CFA is expressly preempted. See, e.g., Beye v. Horizon Blue Cross Blue Shield of N.J., 568 F. Supp. 2d 556 (D.N.J. 2008).

[10] The plaintiffs brought their claim for state law breach of fiduciary duty in their amended complaint. See App. 496. The District Court denied the plaintiffs' motion for leave to amend the complaint as futile because this breach of fiduciary duty claim — the only claim that the plaintiffs sought to add — was preempted. For the reasons stated herein, we agree.

17

plans. To prove breach of contract, a contract must have existed. See Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc., 737 F.3d 879, 900 (3d Cir. 2013). The plaintiffs specifically allege that the contracts that the defendants purportedly breached were the insurance policies they purchased. See App. 50 (Complaint ¶ 171). The defendants owed the plaintiffs fiduciary duties only on account of these agreements.

These claims again relate to the improper denial of benefits because of the war exclusion clause. Claims involving denial of benefits or improper processing of benefits require interpreting what benefits are due under the plan. Because these claims explicitly require reference to the plan and what it covers, they are expressly preempted. See Pilot Life, 481 U.S. at 47-48 (breach of contract claim expressly preempted); accord Pane v. RCA Corp., 868 F.2d 631, 635 (3d Cir. 1989).

## C.

The plaintiffs' claim for punitive damages is conflict preempted by ERISA's exclusive civil remedy scheme in § 502(a). As we have previously held, the Supreme Court's decision in "Aetna Health confirms that conflict preemption applies to any 'state cause of action that provides an alternative remedy to those provided by the ERISA civil enforcement mechanism' because such a cause of action 'conflicts with Congress' clear intent to make the ERISA mechanism exclusive.'" Barber, 383 F.3d at 140 (quoting Aetna Health, 542 U.S. at 214 n.4). Congress did not make punitive damages available under ERISA. "The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." Pilot Life, 481 U.S. at 54. Because Congress did not choose to include punitive damages as an available remedy, ERISA § 502(a) conflicts with and preempts the plaintiffs' state law claim. See Pane, 868 F.2d

18

at 635 & n.2 (ERISA preempted claim for punitive damages).[11]

## V.

For the foregoing reasons, we will affirm the order of the District Court dismissing the plaintiffs' complaint for failure to state a claim and denying leave to file an amended complaint.

---

[11] The plaintiffs also argue that their state law claims are not preempted because another remedy they seek — return of premiums — is not available under ERISA. This argument conflates potential remedies with causes of action, and is also irrelevant. Any state laws that supplement the remedies available under ERISA conflict with the "clear congressional intent to make the ERISA remedy exclusive." Aetna Health, 542 U.S at 209. Furthermore, this kind of relief may well be available under ERISA § 502(a). The Supreme Court recently held, albeit in a different context, that "other appropriate equitable relief" in § 502(a)(3) may consist of "monetary compensation for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1880 (2011) (quotation marks omitted). Several Courts of Appeals have held that the remedy of return of premiums is available under ERISA § 502(a). See, e.g., Kenseth v. Dean Health Plan, Inc., 722 F.3d 869, 882 (7th Cir. 2013); McCravy v. Metro. Life Ins. Co., 690 F.3d 176, 182-83 (4th Cir. 2012); Amschwand v. Spherion Corp., 505 F.3d 342, 348 (5th Cir. 2007); Callery v. U.S. Life Ins. Co. in City of New York, 392 F.3d 401, 407 (10th Cir. 2004).